IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL LLOYD TYREE,

        Petitioner,

    v.

MARK NOOTH,

        Respondent.

Case No. 2:12-cv-00192-JE

FINDINGS AND RECOMMENDATION

Tonia Moro, Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

    Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Samuel A. Kubernick, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

    Attorneys for Respondent

1 - FINDINGS AND RECOMMENDATION

JELDERKS, Magistrate Judge.

Petitioner, Paul Tyree, brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his state-court convictions for Sexual Abuse and Sodomy. For the reasons that follow, the Petition for Writ of Habeas Corpus (#2) should be granted in part and denied in part.

## BACKGROUND

Petitioner befriended Randee Tyree ("Randee") in early 1999 when Randee was living in Missouri with her then-husband David Rodriguez ("David") and Randee's eight-year-old daughter, MV, who was the product of an earlier relationship of Randee's. Randee and David had their own biological daughter, SR, who at that time was living with David's mother, Glenna Rodriguez, near Fresno California. SR was five years old.

Randee testified that David had been physically and sexually abusive to her. Trial Transcript, pp. 354-55. Randee testified that David was also sexually abusive to MV, and that he had disclosed to Randee that he had been "touching her private area, and . . . he was making her suck on him." *Id* at 356. Although Randee reported this to police officers and "case workers," nothing was ever done.[1] *Id.*

---

[1] Randee believed the police protected David from prosecution because he was an informant for them. Petitioner's Exhibit 1.

2 - FINDINGS AND RECOMMENDATION

David had been on probation for unrelated criminal conduct, and when he violated that probation (through conduct not pertaining to his purported abuse of MV), the violation resulted in a four-month jail sentence. Randee took that opportunity to leave David, and she and MV moved in with petitioner.

That summer, petitioner, Randee, and MV left Missouri. They drove to California where they showed up unannounced at Glenna's home in order to pick up SV. They then traveled to Oregon where petitioner had found a job through Randee's father as a pipefitter in Albany. In Oregon, MV disclosed to authorities that David had sexually abused her. On March 31, 2000, Jodie Peake, a child protective services worker, interviewed MV. MV told her that David made her touch his penis and that he placed it in MV's vagina, rectum, and mouth. *Id* at 407. Although she had the opportunity, MV did not tell Peake that petitioner had ever abused her. However, Peake did not specifically ask that question or ask whether anyone was abusing her at the time of the interview.[2] *Id* at 408-09.

Due to the disclosure of David's abuse, MV participated in an eight-week counseling program at the ABC House in Albany. At no time during that eight weeks did she allege that petitioner was abusing her. When she engaged in an exercise whereby she drafted

---

[2] Peake later acknowledged that she should have conducted a more thorough interview. Trial Transcript, p. 409.

3 - FINDINGS AND RECOMMENDATION

a letter of apology purporting to be written to her from her assailant, she signed it "David." *Id* at 456-57.

When David was released from jail, he filed for divorce from Randee and sought custody of SR. David's mother Glenna also sought custody of SR in that divorce proceeding. Randee and David were officially divorced in Missouri and, on May 31, 2000, the Missouri court awarded custody of SR to Glenna, finding that neither David nor Randee were suitable parents. Respondent's Exhibit 133. As a result, SR returned to California where she again resumed living with Glenna.

Glenna was of the opinion that SR's sexual knowledge was advanced for a girl her age, leading her to suspect that SR may have been sexually abused. She asked SR on numerous occasions whether anyone had touched her inappropriately. She asked SR about this approximately every two months or so for a period of about two and a half years. *Id* at 234-35. The first few times Glenna asked SV about any potential abuse, she specifically asked whether petitioner had touched her inappropriately. *Id* at 235. She testified that thereafter, she omitted asking specifically about petitioner so as not to lead SV to make an accusation against him. *Id* at 238. SR repeatedly denied that anyone had touched her until the final time Glenna asked. SR told Glenna that petitioner would put chocolate on his penis and make her suck it off, and that

4 - FINDINGS AND RECOMMENDATION

stuff would come out that "'tasted like pee-pee or something.'" *Id* at 209-12.

Glenna called the police in California, and Officer Alvarez interviewed SR. SR told Officer Alvarez that petitioner would make MV and her give him oral sex before they could go outside to play. *Id* at 524. Glenna also called the authorities in Missouri, where petitioner, Randee, and MV were living once again. She spoke with a social worker named Tracy Collins who would be integral in the investigation of petitioner. Glenna told Collins that she had always suspected petitioner of abusing SR, and that petitioner forced the girls to lick chocolate off of his penis. *Id* at 283-84, 393.

Collins immediately set up an interview with MV at her school the same day Glenna contacted her.[3] The school counselor was present and disclosed to Collins that MV was Educationally Mentally Handicapped and would do just fine in an interview, but could be easily manipulated into not telling the truth. *Id* at 269, 286. When Collins asked MV about any inappropriate touching, MV said that David had abused her but denied that anyone else had. *Id* at 270-71, 275. MV "didn't go into the details [about David] other

---

[3] MV's mother was not present for the interview and had no contact with MV prior to Collins' interview with MV. *See* Trial Transcript, p. 268 (after receiving the call from Glenna, Collins "went directly to the school to interview [MV], because [she] felt it was a safety issue, immediately."). MV's school was "right across the street" from Collins' office. *Id.*

5 - FINDINGS AND RECOMMENDATION

than that he had touched her and he was very mean about it." *Id* at 273. MV was "very angry about that." *Id* at 274. Even though the interview was in Missouri and David's alleged abuse had taken place in Missouri, Collins asked no details and did no follow up, apparently being satisfied with MV's statement that she had told a lot of people about it. According to Collins, MV told her that there was something else to tell but she did not want to talk about it and simply shut down. *Id* at 275.

Approximately one month later, the investigating detective in Oregon told Collins that in the absence of allegations by MV against petitioner, the case against him would be dropped. *Id* at 383, 399. As a result, Collins went to MV's school to interview her a second time. Collins had seen MV between five and ten times in the month that passed between the first and second interviews. *Id* at 397. Collins testified that during the second interview, MV recounted a time when she and SR wanted to sleep in the same bed together, and petitioner said they could if they did something for him. *Id* at 386. She claimed that while petitioner had not touched SR or her, he had forced them to touch his penis with their hands. *Id* at 388. She said that something came out of petitioner's penis, and that he wiped it on a rag. *Id*. She did not say anything about oral sex or chocolate. *Id* at 401.

According to Collins, MV repeated these allegations in front of a co-worker of Collins, but refused to do so on video. MV also

6 - FINDINGS AND RECOMMENDATION

told Collins that she could not repeat the allegations for her mother who was waiting outside the interview room. *Id* at 390-92. MV stated that although she was the older sister, she was not as brave as SR. *Id* at 390.

At trial, SR stated that petitioner made MV and her perform oral sex on him more than seven times, and when he ejaculated, they were not near him. *Id* at 175-177. MV, on the other hand, testified that she had never seen petitioner naked. *Id* at 325. Inexplicably, neither the prosecutor on direct examination nor defense counsel on cross examination directly asked MV, the older of the two alleged victims, whether petitioner had committed the acts against her as alleged in the Indictment. Defense counsel also did not ask MV whether she had told Collins that petitioner had abused her in any way.

Randee testified that she had spoken to the defense investigator, Verne Hoyer, several times and told him that petitioner was innocent. *Id* at 367-69. Although these conversations were recorded, and included three conversations between MV and Hoyer wherein MV consistently denied petitioner had ever abused her, petitioner's counsel did not seek to admit these recordings or call Hoyer to testify.

The jury convicted petitioner of Sodomy in the First Degree (Count One) and Sexual Abuse in the First Degree (Count Two) as to SR, and Sexual Abuse in the First Degree (Count Four) as to MV.

7 - FINDINGS AND RECOMMENDATION

The jury found him not guilty of Sodomy in the First Degree (Count Three) involving MV. As a result of the guilty verdicts, the trial court sentenced petitioner to 175 months in prison.

Petitioner took a direct appeal, and the Oregon Court of Appeals affirmed the trial court without opinion, and the Oregon Supreme Court denied review. *State v. Tyree*, 209 Or. App. 170 (2006), *rev. denied* 342 Or. 645 (2007).

Petitioner next filed for post-conviction relief ("PCR") in Malheur County where the PCR trial court denied relief. Respondent's Exhibit 151. The Oregon Court of Appeals affirmed the denial of petitioner's claims on their merits, but remanded the case for the entry of a second judgment which included findings required by ORS 138.640(1). *Tyree v. Nooth*, 245 Or. App. 297 (2011). The Oregon Supreme Court denied review. 351 Or. 3189 (2011).

Petitioner filed this 28 U.S.C. § 2254 habeas corpus case on February 2, 2012 in which he pursues a single issue: whether trial counsel was constitutionally ineffective when he failed to present the prior consistent statements MV made to Hoyer which directly refuted the State's allegations and impeached key witnesses. Respondent asks the court to deny relief on the Petition because: (1) petitioner's first ground for relief is not argued, does not state a federal claim, and is procedurally defaulted; and (2) the

8 - FINDINGS AND RECOMMENDATION

Oregon state court decision denying relief on his ineffective assistance of counsel claim is entitled to deference.

## DISCUSSION

### I. Standard of Review

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct

9 - FINDINGS AND RECOMMENDATION

governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413.  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410.  The state court's application of clearly established law must be objectively unreasonable.  *Id* at 409.

## II.  Unargued Claim of Ineffective Assistance of Counsel

As Ground One of his Petition for Writ of Habeas Corpus, petitioner alleges that the trial court should have allowed his expert witness to testify fully about questions asked by the police interviewer of the child victims.  In his supporting memorandum, however, petitioner chooses to brief only his claim of ineffective assistance of counsel pertaining to counsel's alleged failure to present evidence of MV's prior consistent statements.

Petitioner does not argue the merits of his remaining claim, nor does he address any of respondent's arguments as to why relief on the unargued claim should be denied.  As such, petitioner has not carried his burden of proof with respect to this unargued claim.  *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (petitioner bears the burden of proving his claims).

## III. Ineffective Assistance of Counsel

Petitioner asserts that his trial attorney was constitutionally ineffective when he failed to offer exculpatory

10 - FINDINGS AND RECOMMENDATION

evidence on his behalf in the form of MV's recorded statements to Hoyer. Because no Supreme Court precedent is directly on point that corresponds to the facts of this case, the court uses the general two-part test established by the Supreme Court to determine whether petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 129 S.Ct. at 1420.

11 - FINDINGS AND RECOMMENDATION

During his PCR trial, petitioner offered audio recordings of Hoyer's conversations with MV to support his claim of ineffective assistance of counsel. His criminal trial attorney offered an affidavit in response to the claims made against him wherein he stated that he did not recall the existence of any audio evidence that was taken by Hoyer that would have been admissible or helpful at trial. Respondent's Exhibit 143, pp. 3-4. However, counsel thereafter filed a second affidavit which contained the following:

> In preparation for addressing the allegations made by petitioner in this case, I reviewed what I believed to be my entire file. As it turned out, it was simply the paper file. Subsequent to my review of that file and provision of an affidavit in this case, I reviewed a statement by Verne Hoyer, my investigator in petitioner's case, wherein he states that he provided me with an audiotape of an interview with M.V., one of the child victims. I looked for any such copy of that tape and was able to locate that tape in an additional file that I was not aware of. This trial occurred over 5 years ago, and I did not remember receiving that tape. It seems that I did have that tape and did review it.

Respondent's Exhibit 149, pp. 1-2. Counsel did not address how this discovery may have affected his analysis within his prior affidavit, nor did he attempt to explain his rationale for not offering the contents of the audio evidence at petitioner's trial.

The PCR trial court initially issued a cursory decision wherein it stated: "2 victims consecutive sentences allowed. Petitioner presents insufficient evidence on all other issues."

12 - FINDINGS AND RECOMMENDATION

Respondent's Exhibit 151. The Oregon Court of Appeals found this decision insufficient and remanded the case for the entry of proper findings. In response to this remand, the PCR trial court issued a second judgment which included: "9. No proof of other questions that the attorney should have asked that would have helped" and "10. Attorney did impeach [SR] through the testimony of [MV] and asked questions to allow him to argue in closing that the child's statements at trial were inconsistent with earlier statements." Respondent's Exhibit 159.

Respondent argues that counsel had no basis to introduce the recorded statements of MV where: (1) MV testified at trial and denied that petitioner had sexual contact with her;[4] (2) Randee testified that MV had told her that petitioner was innocent; and (3) a social worker and a counselor testified that MV reported David's abuse, but she never mentioned that petitioner had abused her. Respondent also points out that even Tracy Collins, the person to whom MV allegedly disclosed petitioner's abuse, testified that MV first denied that petitioner had ever abused her. As a result, respondent concludes that the jury heard that, with a single exception, MV had consistently denied any abuse by petitioner such that her recorded statements were simply cumulative and added nothing to the defense. He therefore argues that counsel

---

[4] This overstates MV's actual testimony as she was not asked that specific question.

13 - FINDINGS AND RECOMMENDATION

was not constitutionally obliged to offer the evidence, and petitioner suffered no prejudice from its omission.

Respondent also points out that MV's mother was present for the investigator's interviews, a fact that could have been stressed by the prosecution to bolster its argument that MV's mother coached her as to what to say.[5]  Thus, according to the State, the evidence was not only cumulative but potentially damaging.

It is apparent that this was not a particularly strong case for the prosecution, and it was not without its troubling aspects. SR, who was very young at the time of the abuse, made her allegations against petitioner only after periodic questioning on the subject by her grandmother for approximately two and a half years.  Glenna had become convinced that SR had been abused in the past, and even went so far as to purchase a book for SR that covered the anatomical differences between men and women.  Trial Transcript, pp. 182-83, 225-226.  Because SR was too young to read the book, Glenna read it to her.  *Id* at 226.

Not only was Glenna convinced that SR had been sexually abused, she was also convinced that her son, David, did not abuse

---

[5] The State argued in closing that Randee had caused MV to lie in order to protect petitioner, and pointed to MV's testimony that "My mom told me to just tell the truth, that my dad didn't do nothing and that my mom's ex-husband did it."  Trial Transcript, p. 326.  However, as noted in FN 3 of this Findings and Recommendation, Collins' first interview with MV occurred before MV had any discussion with her mother about SR's allegations.

SR.  *Id* at 233-34.  As a result, she specifically only ever suggested petitioner's name to SR when asking her whether she had been abused.  Even when SR made the disclosure to Glenna after more than two years of Glenna's inquiries regarding any potential abuse, Glenna did not ask SR who had abused her.  Instead, she specifically asked whether it was petitioner who had abused her.  *Id* at 238.

Glenna's belief that David could not have abused SR stands in stark contrast to MV's consistent allegations against David, all the while she denied any abuse by petitioner.  The only exception to MV's consistent denials of wrongdoing by petitioner was the disclosure Collins claimed MV made to her when the investigating detective in Oregon informed Collins that the criminal case against petitioner would be dropped if MV did not make an allegation against him.

What is critical here is that defense counsel never asked MV during trial whether she had, in fact, told Collins that petitioner abused her, nor did he ask what had transpired during that second interview.  It was this second interview by Collins that empowered Oregon's prosecution of petitioner.  When Hoyer interviewed MV, she not only stated emphatically that petitioner had not abused her, she specifically denied ever telling Collins that petitioner had abused her.  Respondent's Exhibit 158.  This would not have been simply cumulative evidence.

15 - FINDINGS AND RECOMMENDATION

In addition, according to the timeline established in this case, petitioner's alleged abuse of MV occurred during a time when she was in constant counseling for sexual abuse due to David's alleged prior abuse. This was a time when she was encouraged to explore her feelings of abuse and disclose those to counselors, physicians, her mother, and others. It is difficult to believe that petitioner took this as an opportune time to begin abusing MV. Indeed, MV expressed to Linn County health worker Marcy Stolpe that petitioner was one of the adults she felt confident would help her if she approached him with problems in this regard. *Id* at 378.

Although the State could have argued that Randee improperly influenced MV not to disclose the abuse so as to protect petitioner, given MV's apparent suggestibility in light of her status as Emotionally Mentally Handicapped, the defense could have also argued that it was Collins, not Randee, who sufficiently led MV to make a false statement. Even when MV allegedly made the disclosure to Collins during the second interview, she made no mention of oral sex or chocolate. In this way, the accusations did not match those of SR. *Id* at 170-71. It is also important to note that MV's statements to the investigator regarding David's abuse (which included oral sex) involved the assertion that SR was in the same room and awake when the abuse took place. Petitioner's Exhibit 1, (DS_2011 counter 1:41 - 13:01). This would have been

16 - FINDINGS AND RECOMMENDATION

helpful in establishing SR's potential exposure to sexual situations and resulting knowledge about such situations.

After carefully listening to MV's tape recorded statements to investigator Hoyer and reviewing the entire trial transcript, I am satisfied that defense counsel's failure to play the tape recording for the jury fell below an objective standard of reasonableness. The tape recording has MV in her own voice directly and emphatically denying that petitioner ever abused her. This is especially important because she was not asked any questions in court specifically relating to the alleged abuse. The prosecutor most likely did not ask because he thought she would deny the abuse. If defense counsel had a good reason not to question MV specifically about the alleged abuse, which seems doubtful,[6] he had all the more reason to play the recording for the jury because he knew, or should have known, exactly what was on the recording. Also, the recording would have been available for the jury in their deliberations as was the videotape of SR's interview with Detective Alvarez.

Although the presiding juror indicated that not all of the verdicts were unanimous, it is impossible to know which verdicts

---

[6] MV was called as a State's witness and a fully prepared defense counsel could have asked carefully crafted questions on cross examination consistent with petitioner's innocence.

17 - FINDINGS AND RECOMMENDATION

were unanimous because the jury was not polled.[7] When the verdicts are analyzed in light of the totality of the record it is inescapable that, as to Counts 3 and 4 involving MV, 10 or more jurors did not credit SR's testimony but did credit Tracy Collins' testimony. At least 10 jurors apparently found that Tracy Collins was truthful, that she accurately reported what MV said, and that MV's statement to Collins was truthful and accurate. MV's recorded statements refute all of these findings and defense counsel should have presented them to the jury.

In light of the relatively weak case against petitioner as well as the jury's lack of unanimity, the evidence counsel failed to present at trial most likely would have made a difference in the outcome of petitioner's case. Indeed, as previously noted, without an inculpatory statement from MV, the State was prepared to drop the case altogether. I am satisfied that, but for counsel's errors, there is a reasonable probability that the verdict as to Count 4 would have been different. Depending on the jury's vote count as to Count 4, if one, two, or at most three of the jurors voted not guilty on Count 4 after hearing MV's statements on the recordings, petitioner would not have been convicted on Count 4.

---

[7] Oregon is one of only two states that allows non-unanimous jury verdicts in criminal trials. *See Apodaca v. Oregon*, 406 U.S. 404 (1972); *Johnson v. Louisiana*, 406 U.S. 356 (1972).

18 - FINDINGS AND RECOMMENDATION

Even without this strong exculpatory evidence, ten or more jurors voted not guilty as to Count 3.

In contrast to MV, the jury saw and heard SR identify petitioner, and was satisfied as to the guilt of petitioner on both counts as to her.  Consequently, the omitted evidence, even if true, would not have fully exonerated the petitioner as to SR. Although the omitted evidence could **possibly** have changed the result as to Counts 1 and 2, I cannot say with confidence that it **probably** would have been different.

The court is aware of the strict standard of review imposed by the Anti-terrorism and Effective Death Penalty Act, and that it cannot simply substitute it's own opinion for that of the PCR trial court.  But I believe that the decision by the PCR trial court in this case involves an unreasonable application of U.S. Supreme Court precedent when the omitted evidence is listened to in the context of the entire trial.[8]  As a result, the court should grant relief on the Petition as to Count 4 and order petitioner's release from custody on that charge if the State does not provide him with

---

[8] I note that counsel was apparently blindsided in his cross examination of Detective Alvarez who improperly volunteered that he had established that SR's interview statement was credible. Trial Transcript, pp. 248, 254. Vouching for the credibility of a witness is clearly prohibited in Oregon and can constitute reversible error in a case such as this. *State v. Lupoli*, 348 Or. 346, 357, 234 P.3d 117 (2010). However, no issue was made of this at trial and it is not before this court.

19 - FINDINGS AND RECOMMENDATION

a new trial where he can benefit from the effective assistance of counsel.

## RECOMMENDATION

For the reasons identified above, the Petition for Writ of Habeas Corpus (#2) should be granted in part and denied in part. The court should order respondent to immediately recalculate petitioner's sentences and void the sentence as to Count 4 if the petitioner is not given a new trial on Count 4 within 60 days of entry of judgment in this case.

## SCHEDULING ORDER

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due by May 1, 2015. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 14th day of April, 2015.

                 /s/ John Jelderks
                 John Jelderks
                 United States Magistrate Judge